Robert E. BADHAM, Robert Naylor, Eric Seastrand, Aldo Silvestri, Michael W. Cobb, Frank O. Verlot, Donna S. Richardson, Peter Schrager, Jane Baker, Charles A. Meyer, Kirk Lindsey, Donald Driscoll, Roger T. Erickson, D.D.S., Cynthia Trobitz–Thomas, Wally Herger, Lowell Landowski, Jack Hite, Mike Garza, Dennis McQuaid, Rosemary Thakar, Steve Eigenberg, David Williams, Michael LaCrone, Bob Nash, Norman Shumway, Chip Pashayan, David Crevelt, Robert Lagomarsino, Bill Thomas, Elton Gallegly, Carlos Moorhead, George Woolverton, Jerry Zerg, David Baird, Robert Kerns, Robert Scribner, George Adams, Carl Johnson, John W. Almquist, Jackson M. McMurray, Joyce Robertson, David Dreier, Charles House, Jerry Lewis, Bob Henley, Al McCandless, Robert Dornan, William Dannemeyer, Bob Badham, Bill Lowery, Dan Lungren, Ron Packard, Bill Mitchell, and Duncan Hunter, Plaintiffs,

v.

MARCH FONG EU, Secretary of State of the State of California, Defendant,

Assembly of the State of California; the Members of the California Democratic Congressional Delegation, Defendants–Intervenors.

No. C–83–1126–RHS.

United States District Court, N.D. California.

April 21, 1988.

James R. Parrinello, Marguerite Mary Leoni, and Louise J. Rosen–Garcia, Nielsen, Hodgson, Parrinello & Mueller, San Francisco, Cal., and Michael A. Hess, Washington, D.C., for plaintiffs.

John K. Van De Kamp, Atty. Gen., and Robert E. Murphy, Deputy Atty. Gen., San Francisco, Cal., for defendant Secretary March Fong Eu.

Joseph Remcho, Kathleen J. Purcell, and Charles C. Marson, Remcho, Johansen & Purcell, San Francisco, Cal., for defendant-intervenor Assembly of the State of Cal.

Richard H. Borow, Jonathan H. Steinberg, and Bruce A. Wessel, Irell & Manella, Los Angeles, Cal., for defendants-intervenors Members of the California Democratic Congressional Delegation.

## MEMORANDUM OPINION AND ORDER

Before POOLE, Circuit Judge, and ZIRPOLI and SCHNACKE, District Judges.

POOLE, Circuit Judge, with whom ZIRPOLI, District Judge, concurs:

This case involves a constitutional challenge by plaintiffs, Republican congressional representatives and certain registered Republican voters of California, to Assembly Bill 2X, Chapter 6, 1st Extraordinary Session of the 1983–84 California Legislature ("A.B. 2X"), which effected the redistricting of congressional districts in California following the 1980 Census. Pending before us is the defendants-intervenors' motion to dismiss plaintiffs' third amended complaint[1] for failure to state a claim, pur-

---

1. At oral argument, we granted plaintiffs' motion to amend their third amended complaint to add additional plaintiffs. The substance of the complaint was not changed, however, and we shall continue to refer to the complaint at issue as plaintiffs' third amended complaint.

suant to Fed.R.Civ.P. 12(b)(6). We hold that plaintiffs have not alleged, and on this record cannot allege, facts sufficient to state a claim under the Supreme Court's holding in *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). Accordingly, the motion to dismiss is granted with prejudice.

## BACKGROUND

Under the 1970 Federal Decennial Census, California was entitled to 43 congressional seats in the United States House of Representatives.[2] Following the 1980 Census, California became entitled to 45 representatives. In order to effect the necessary redistricting, the California Legislature passed Assembly Bill 301 ("A.B. 301") in September, 1981. At that time, Democratic majorities controlled both houses of the California Legislature, and voting on A.B. 301 followed party lines. Governor Edmund G. Brown, Jr., a Democrat, signed A.B. 301 into law on September 16, 1981.

The same day, the chairman of the California Republican Party and the Republican National Committee began a petition drive aimed at qualifying a referendum on A.B. 301 for the June 1982 ballot.[3] *See Assembly v. Deukmejian,* 30 Cal.3d 638, 644, 180 Cal.Rptr. 297, 639 P.2d 939 (1982), *appeal dismissed and cert. denied, Republican Nat'l Comm. v. Burton,* 456 U.S. 941, 102 S.Ct. 2003, 72 L.Ed.2d 463 (1982). The referendum was successful and resulted in preventing A.B. 301 from taking effect of its own force; nevertheless, the California Supreme Court ordered that the challenged districts be used for the June 1982 and November 1982 elections because they were the only practical alternative. *Assembly v. Deukmejian,* 30 Cal.3d at 678, 180 Cal.Rptr. 297, 639 P.2d 939.

In the November 1982 general election for representatives in Congress, 28 Democrats and 17 Republicans were elected under the A.B. 301 districts. In the same election, George Deukmejian, a Republican, was elected to succeed Brown as Governor, defeating Los Angeles Mayor Thomas Bradley, a Democrat. Brown, whose term was due to expire on January 2, 1983, called an extraordinary session of the Legislature, which convened on December 6, 1982. On December 29, A.B. 2X, a previously-passed Board of Equalization reapportionment bill, was withdrawn from Governor Brown's desk and amended to include new congressional districts, allegedly based on the rejected A.B. 301 districts. As amended, A.B. 2X was passed by both houses on a party-line vote. Governor Brown signed A.B. 2X into law shortly before leaving office on January 2, 1983.

## PRIOR PROCEEDINGS

On March 4, 1983, plaintiffs filed the original of this action, alleging that A.B. 2X violated several state laws, as well as federal constitutional provisions. Pursuant to 28 U.S.C. § 2284, this three-judge district court was convened to hear the challenge to the constitutionality of the apportionment of the congressional districts at issue.

Perceiving that a resolution favorable to the plaintiffs on any of their state claims might partially or completely avoid the need to address the federal constitutional issues, we ordered abstention so that plaintiffs' state-law claims could be considered by the California courts. *Badham v. March Fong Eu,* 568 F.Supp. 156 (N.D. Cal.), *aff'd sub nom. Badham v. United States Dist. Court,* 721 F.2d 1170 (9th Cir. 1983). After the circuit court decision of affirmance was filed, but before expiration of the time within which to petition for

---

2. The redistricting plan following the 1970 Census was prepared by Special Masters appointed by the California Supreme Court after the Legislature and then-Governor Ronald Reagan failed to reach agreement. *See Legislature v. Reinecke,* 10 Cal.3d 396, 110 Cal.Rptr. 718, 516 P.2d 6 (1973). In the November 1980 election, 22 of the 43 seats were won by Democrats; 21 by Republicans.

3. Under California law, a referendum to approve or reject a statute must be held if a sufficient number of voters sign a petition within 90 days of the statute's enactment. Cal. Const., art. II, §§ 9, 10.

rehearing pursuant to Fed.R.App.P. 40(a), plaintiffs filed a petition for writ of mandate in the California Supreme Court tendering the state-law issues and asking for a decision within 30 days. That court denied the petition on the grounds that the circuit court opinion had not become final, that plaintiffs' delay had prevented resolution of the factual dispute by the date they claimed to be essential, and that the relief requested was inappropriate. *Badham v. March Fong Eu,* No. S.F. 24638 (Cal. Sup.Ct. Oct. 27, 1983).

On December 12, 1983, plaintiffs requested this court to reassert jurisdiction and to grant leave to file a second amended complaint, purportedly abandoning the state-law claims. The amended complaint was tentatively permitted to be filed, and we scheduled oral argument to determine whether to terminate abstention. After hearing argument and reviewing the parties' submissions, we concluded that the state-law issues were still implicit in the case and that the basis for abstention as previously set forth was still valid, and we again ordered the parties to seek resolution of the issues in state court. *Badham v. March Fong Eu,* No. C–83–1126 (N.D.Cal. June 19, 1984) (Schnacke, District Judge, dissenting), *aff'd mem. sub nom. Badham v. United States Dist. Court,* 749 F.2d 36 (9th Cir.1984), *cert. denied sub nom. Badham v. Secretary of State,* 470 U.S. 1084, 105 S.Ct. 1844, 85 L.Ed.2d 143 (1985).

In the meantime, following our second order of abstention, the parties had become actively involved in a suit in the Superior Court of California in Los Angeles, which had been filed by the defendants seeking a declaration of the validity of A.B. 2X. As our previous orders had noted, we viewed that pending litigation as a possible, though not exclusive, vehicle for resolving the state claims. Some efforts were made to reach stipulations which might enable those issues to be tried by the state court, but the parties could not reach agreement. After the Supreme Court denied certiorari, the parties again returned to this court and jointly requested that we vacate abstention and allow them to proceed to trial on plaintiffs' second amended complaint. With

some concern about whether the state law issues had really been removed, we agreed to vacate abstention and reassert jurisdiction.

Following argument on defendants' motion to dismiss plaintiffs' second amended complaint, we concluded that our wisest course was to await the final outcome of *Bandemer v. Davis,* 603 F.Supp. 1479 (S.D. Ind.1984), *rev'd, Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), which was then pending before the United States Supreme Court. In *Bandemer,* a three-judge district court had held the redistricting of the Indiana legislative districts to be unconstitutional, on the theory that a partisan political gerrymander violated the Equal Protection Clause of the Fourteenth Amendment. As the plaintiffs' second amended complaint raised issues virtually identical to those before the Supreme Court in *Bandemer,* we ordered all proceedings stayed pending the Supreme Court's decision. *Badham v. March Fong Eu,* No. C–83–1126 (N.D.Cal. Sept. 19, 1985), *aff'd mem. sub nom. Badham v. United States Dist. Court,* 785 F.2d 314 (9th Cir.1986).

After the Supreme Court rendered its decision in *Davis v. Bandemer,* plaintiffs were granted leave to file a third amended complaint. Defendants again moved to dismiss, and we heard argument on the motion on December 5, 1986.

## DISCUSSION

### I. FIRST CAUSE OF ACTION

Plaintiffs' major contention is that A.B. 2X is "an intentional, invidious and effective gerrymander" that violates the Equal Protection Clause of the Fourteenth Amendment by diluting the strength of Republican voters in California. Before considering the merits of this claim, however, we must briefly address the defendants' contention that this question is nonjusticiable.

#### A. *Justiciability*

■ In *Davis v. Bandemer,* the Court held that a partisan gerrymandering claim

was justiciable under the equal protection clause. 106 S.Ct. at 2803–07. Defendants argue that we should distinguish this case because *Bandemer* involved a challenge to *state* legislative redistricting, whereas this case involves a challenge to *congressional* redistricting.

We find this argument unpersuasive. Defendants' first contention, that Article I, Section 4 of the Constitution [4] represents a "textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), was rejected by the Supreme Court in *Wesberry v. Sanders*, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964):

> [W]e made it clear in *Baker* that nothing in the language of [Article I, Section 4] gives support to a construction that would immunize state congressional apportionment laws which debase a citizen's right to vote from the power of courts to protect the constitutional rights of individuals from legislative destruction …

376 U.S. at 6, 84 S.Ct. at 529.

Defendants attempt to distinguish *Wesberry* on the ground that *Wesberry* involved a numerical rule of law that could be applied without "expressing a lack of the respect due [a] coordinate branch[ ] of Government." *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710. This argument, however, was rejected in *Bandemer:*

> The mere fact, however, that we may not now similarly perceive a likely arithmetic presumption in the instant context does not compel a conclusion that the claims presented here are non-justiciable.

106 S.Ct. at 2805.

We find nothing in *Bandemer's* justiciability analysis that turns on the distinction between congressional redistricting and state legislative redistricting. Accordingly, we will address the merits of defendants' motion to dismiss.

**4.** Article I, Section 4 provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the

### B. *The Threshold Effects Test*

In assessing whether plaintiffs have sufficiently alleged an equal protection claim under *Davis v. Bandemer,* we must first grapple with the fact that no single opinion in *Bandemer* commanded the assent of a majority of the court. Of the six justices who believed that partisan gerrymandering claims were justiciable, a plurality of four held that "a threshold showing of discriminatory vote dilution is required for a prima facie case of an equal protection violation." 106 S.Ct. at 2816 (opinion of White, J., joined by Brennan, Marshall and Blackmun, JJ.). Two justices dissented, expressing the view that "a state legislature violates the Equal Protection Clause by adopting a redistricting plan designed solely to preserve the power of the dominant political party." *Id.* at 2825 (opinion of Powell, J., joined by Stevens, J.). Three justices concurred in the result on the ground that partisan gerrymandering claims were simply non-justiciable. *Id.* at 2816–17 (opinion of O'Connor, J., joined by Burger and Rehnquist, JJ.).

Despite this tripartite division of views, it is clear that we must apply the "threshold" test advocated by the plurality. In *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), the Court was faced with determining the effect of a prior case, *Memoirs v. Massachusetts,* 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), in which three separate opinions supported the judgment. The Court said:

> When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds…." *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15 [96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859] (1976) (opinion of Stewart, Powell and Stevens, JJ.).

Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

*Marks,* 430 U.S. at 193, 97 S.Ct. at 993. Thus, by analogy, we may treat the plurality's analysis in *Bandemer* as "constitut[ing] the holding of the Court and provid[ing] the governing standards," to be applied to this case. *Marks, supra* at 194, 97 S.Ct. at 994.

The plurality in *Bandemer* began by setting forth the elements of the claim: "in order to succeed ... plaintiffs were required to prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." 106 S.Ct. at 2808. Although the dissenters agreed with this initial statement, *see id.* at 2825 (opinion of Powell, J.), the plurality disagreed with the dissenters' position that "disproportionate elections results alone are a sufficient effect to support a finding of a constitutional violation." *Id.* at 2815. Rather, the plurality found it "appropriate to require allegations and proof that the challenged legislative plan has had or will have effects that are sufficiently serious to require intervention by the federal courts in state reapportionment decisions." *Id.* at 2811. The rationale for this requirement

> rest[s] on a conviction that the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representatives of its choice does not render that scheme constitutionally infirm. This conviction, in turn, stems from a perception that the power to influence the political process is not limited to winning elections. An individual or a group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district. We cannot presume in such a situation, without *actual proof* to the contrary, that the candidate elected will entirely ignore the interests of those voters. This is true even in a safe district where the losing group loses election after election. Thus, a group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme that makes winning elec-

tions more difficult, and a failure of proportional representation alone does not constitute impermissible discrimination under the equal protection clause.

*Id.* at 2810. Based on this rationale, the plurality concluded that the effects threshold required a more broad-based inquiry than present or projected election results under the challenged districts. Specifically:

> [U]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or group of voters' influence *on the political process as a whole.*

*Id.* (emphasis added).

Relying on previous successful challenges in racial gerrymandering cases, the plurality elaborated on the nature of the "threshold showing" that was required:

> In the individual multi-member district cases, we have found equal protection violations only where a history of disproportionate results appeared in conjunction with strong indicia of lack of political power and the denial of fair representation. See *supra*, at 2809. In those cases, the racial minorities asserting the successful equal protection claims had essentially been *shut out of the political process.* In the statewide political gerrymandering context, these prior cases lead to the analogous conclusion that equal protection violations may be found only where a history (actual or projected) of disproportionate results appears in conjunction with similar indicia. The mere lack of control of the General Assembly after a single election does not rise to the requisite level.

*Id.* at 2814 (emphasis added).

With these standards in mind, we now examine the specific allegations of the complaint to see if a sufficient "threshold effect" has been alleged.

## C. *Sufficiency of the Complaint*

As an initial matter, it is clear that the complaint sufficiently alleges a discriminatory intent. Indeed, the complaint is re-

plete with specific allegations tending to show a discriminatory intent, such as the pleaders' allegations of the "uncouth, irregular and bizarre configurations" of the districts and of the eleventh-hour legislative maneuvering to get the bill approved before a Democratic governor left office. The *Bandemer* plurality noted that "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." 106 S.Ct. at 2809. Thus, as in *Bandemer*, we will focus our attention on the sufficiency of the "effects" alleged by the plaintiffs.

The first "effects" inquiry concerns the "history (actual or projected) of disproportionate [election] results." *Id.* at 2814. Here, the allegations of the complaint are numerous. We are told that A.B. 2X "operates to minimize or cancel out [plaintiffs'] votes and voting strength," and that "[p]laintiffs' votes are persistently degraded and diluted both in individual districts ... and on a statewide basis." More specifically, plaintiffs allege that A.B. 2X "locks in grossly disproportionate election results" throughout the decade by "allocat[ing] a substantial and permanent majority of seats to Democratic party candidates in percentages far superior to the statewide voting strength of Democratic voters."

In the 1984 election, Republicans received 50.1% of the vote statewide, but received only 40% of the congressional seats (18 of 45). This disparity narrowed somewhat in 1986, when Republicans received 46.9% of the vote and retained the same 18 seats. Plaintiffs have alleged that these results are the direct consequence of A.B. 2X and that they are a reliable prediction of future elections.

The parties disagree over whether these allegations are sufficient to satisfy the first prong of *Bandemer's* "effects" test. Plaintiffs contend that the only deficiency in *Bandemer* was that the plaintiffs there relied solely on the results of a single election, whereas plaintiffs here have alleged that "the 1981 reapportionment would consign the [Republicans] to a minority status

throughout the 1980's." *Id.* at 2812. Defendants argue that plaintiffs must show much more serious deficiencies, such as those shown in the racial gerrymandering cases, and in addition must show that "the [Republicans] would have no hope of doing any better in the reapportionment that would occur after the 1990 census." *Id.*

■ We need not resolve this dispute, however, because in any case it is clear that plaintiffs cannot satisfy the second prong of the "effects" test. In order to satisfy the second prong, plaintiffs must show "strong indicia of lack of political power and the denial of fair representation." 106 S.Ct. at 2814. The *Bandemer* plurality specifically based this requirement on its prior "cases relating to challenges by racial groups to individual multimember districts," *id.* at 2810 n. 13, and noted that "[i]n those case, the racial minorities ... had essentially been shut out of the political process." *Id.* at 2814.

It is on this second prong of the "effects" threshold that plaintiffs' complaint falters. Specifically, there are no factual allegations regarding California Republicans' role in "the political process as a whole." *Id.* at 2810. There are no allegations that California Republicans have been "shut out" of the political process, nor are there allegations that anyone has ever interfered with Republican registration, organizing, voting, fund-raising, or campaigning. Republicans remain free to speak out on issues of public concern; plaintiffs do not allege that there are, or have ever been, any impediments to their full participation in the "uninhibited, robust, and wide-open" public debate on which our political system relies. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

Particularly conspicuous by its absence is any allegation that plaintiffs' interests are being "entirely ignore[d]" by their congressional representatives. *Bandemer*, 106 S.Ct. at 2810. Instead, plaintiffs claim that Democratic incumbents will be re-elected "without need to attend to the views of fragmented and submerged Republican minorities in their districts." Such an allega-

tion is insufficient under *Bandemer;* the plurality in that case specifically cautioned that such a presumption of disregard would not be countenanced without proof, even in so-called "safe" districts. *Id.* at 2810. Nowhere do plaintiffs suggest that they can prove disregard by any means other than by inference from the election results, a method which *Bandemer* removes from our purview.

A further example of how the complaint fails to measure up is contained in the following passage:

> A.B. 2X locks in grossly disproportionate election results and has other invidious effects including, without limitation, the destruction of Republican incumbencies, the wasting of Republican votes, the minimization of Republican voters' opportunity to elect congressmen of their choice, the systematic elimination of political competition, discrimination based on political association and other effects as detailed below.

Complaint at 13. Obviously, plaintiffs have attempted to couch this allegation in terms of *Bandemer's* two prongs. However, all of the alleged "other invidious effects" are merely different ways of repeating central allegation that A.B. 2X causes disproportionate election results. The language "discrimination based on political association" *might* be considered to allege an effect of the kind needed, but this single statement is conclusory and it is not supported by any other inference-generating facts alleged in the complaint.

The only other "effect" alleged that is different from a mere claim of disproportionate election results is the allegation that the "bizarre and irregular" shapes of the districts cause voter confusion and apathy and make it difficult for congressmen to communicate with their constituents. However, this allegation is not limited to Republican voters or congressmen; it applies equally to all voters and congressmen affected by the plan. Nothing in the complaint suggests that somehow Republican voters are differentially affected by the alleged apathy. In addition, this argument was raised by the plaintiffs in *Bandemer*,

*see* 106 S.Ct. at 2833 (dissenting opinion), but the plurality did not even consider it worthy of comment.

Plaintiffs protest that the only factual deficiency in *Bandemer* was that the plaintiffs there relied *only* on the results of a single election, and the district court specifically refused to find that that election was a reliable prediction of future elections. *See Bandemer* at 2812. Plaintiffs maintain that it is sufficient to show that they cannot achieve proportionate representation throughout the 1980's. While it is possible that plaintiffs have cured the *Bandemer* plaintiffs' deficiency in this one regard, we disagree with their argument that that was the only deficiency apparent in the case. The plurality opinion specifically required "a history (actual or projected) of disproportionate results ... *in conjunction with* [other] indicia." *Id.* at 2814 (emphasis added). We cannot accept plaintiffs' invitation to ignore the second prong of the "threshold effects" test. Accordingly, plaintiffs first cause of action must be dismissed.

### D. *Leave to Amend*

Before moving on to consider plaintiffs' other constitutional claims, we next consider whether plaintiffs should be granted another opportunity to amend their complaint. For the following reasons, we believe such an opportunity would be unavailing.

Our major reason for refusing another amendment is that the history of this litigation indicates, both implicitly and explicitly, that the Republicans have taken their best shot. Plaintiffs second amended complaint was based on the district court opinion which the Supreme Court reversed in *Bandemer*. After that reversal, we gave plaintiffs an opportunity to amend their complaint to attempt to state a claim in light of *Bandemer*. Plaintiffs had the *Bandemer* opinion to work with, and they have acknowledged in their moving papers that *Bandemer* requires something more than disproportionate election results (although they dispute the extent of this requirement), yet their third amended complaint is notably devoid of material allegations on

this score. Although the complaint uses language similar to that used in *Bandemer*, such as "other invidious effects" and "[a lack of] fair and effective representation," this conclusory language cannot disguise the fact that the only factual basis underlying these claimed effects is plaintiffs' assertion of disproportionate underrepresentation. It is all too easy to infer from this studious avoidance of *any* material allegations of non-election based "effects" that plaintiffs realize that no such effects exist.

We do not have to rely solely on inference, however, because we repeatedly invited plaintiffs at oral argument to advise whether they were aware of any additional facts which would strengthen their complaint, and plaintiffs repeatedly declined our invitation to call such facts to the attention of the court. This colloquy, which is set forth in the margin,[5] amply demonstrates plaintiffs' acknowledgement of their inability to come forward in good faith with any additional allegations supportable by evidence in court. For this reason, we conclude that further opportunity to amend would be unavailing.

We believe that plaintiffs' litigation posture is itself sufficient reason to dispense with further attempts at amendment. However, we also may take judicial notice of other facts which demonstrate that California Republicans are far from being effectively "shut out" of the political process. Instead, California Republicans represent so potent a political force that it is unnecessary for the judiciary to intervene, as we would be constrained to do to protect the trampled rights of a disadvantaged political or racial minority.

Chief among our observations is our undisputed knowledge that California Republicans still hold 40% of the congressional seats, a sizeable bloc that is far more than mere token representation. It simply would be ludicrous for plaintiffs to allege that their interests are being "entirely ignore[d]" in Congress when they have such a large contingent of representatives who share those interests. We also note that California has a Republican governor, and one of its two senators is a Republican. Given also that a recent former Republican governor of California has for seven years been President of the United States, we see the fulcrum of political power to be such as to belie any attempt of plaintiffs to claim that they are bereft of the ability to exercise potent power in "the political process as a whole" because of the paralysis of an unfair gerrymander.

An additional fact further strikes us as extremely indicative of the political power of Republicans in California: plaintiffs admit that the Republicans were able to overturn the original redistricting bill, A.B. 301, through resort to California's referendum process. This display of California Republicans' political might demonstrates their ability to protect themselves from political subjugation. Plaintiffs complain that their effort was undone by the passage of A.B.

---

**5.** The Court: "Do you believe that you have now, in your first claim, you have set forth the necessary showing for a claim of equal protection violation as the Court has said in *Bandemer?* Are you prepared to rest on that?
Mr. Parrinello [Counsel for Plaintiffs]: We believe that we have your honor. But out of an abundance of caution, if the court feels that there are other things that could be alleged that would be helpful to the court, ... I would request the opportunity to understand what those facts were that the court felt were important, and—
The Court: I don't think we have any concern one way or the other. It's your complaint that you have got to defend.
　　*　　*　　*　　*　　*　　*
Mr. Parrinello: We believe the complaint states a claim under *Bandemer v. Davis.*

The Court: You are prepared to stand on it?
Mr. Parrinello: We are prepared to stand on it.
The Court: There is nothing else of great significance at this time that you believe would make any difference, add to it in substantial particulars which you think we ought to have before us before we rule?
Mr. Parrinello: May I have a minute to discuss that with my counsel?
　　*　　*　　*　　*　　*　　*
[Counsel was given an opportunity to confer while defendants made their reply argument.]
The Court: Do you think you can improve the complaint in any way?
Mr. Parrinello: Your honor, we'll stand on the complaint as alleged."
Reporter's Transcript of Proceedings, December 5, 1986, at 59–60 and 67.

2X, but they cannot satisfactorily explain why there was not available a return to the same populace which had so recently supported them in their struggle for fair representation. We do not suggest that plaintiffs were subject to any kind of "exhaustion" requirement, but we note that a resource which the pleadings show they indulged in at the outset has inexplicably not been accounted for. We do not require plaintiffs to resort to the state referendum procedure; we are merely cognizant that the third amended complaint is mute as to why it was not an available tool open to them while simultaneously pursuing their state and federal legal remedies. A petition signed by more than 5% of the voters would have prevented A.B. 2X from taking effect until after a referendum took place. A successful referendum vote would have killed the gerrymander, because a Republican governor had taken office. In a practical and realistic sense, we cannot ignore this very real example of the California Republicans' political power simply because they have not elected to exercise it when a similar situation arose again.[6]

A quick comparison with the facts of the racial gerrymandering cases on which *Bandemer* was based demonstrates the distance of the Republicans from alleging a claim. For example, in *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), Blacks constituted 38% of the voters in Burke County Georgia, but had never won a single seat. In *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), Blacks constituted "about one-third of the electorate" but had never won a single seat. In cases under the Voting Rights Act, the Court has emphasized that "minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process."

*Thornburg v. Gingles*, 478 U.S. 30, 45, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986). Republicans in California cannot claim to have been treated as political pariahs; they have been a formidable, and sometimes dominant, force. On this point, we agree with the defendants that "even the bounds of normal political exaggeration are exceeded when the Republicans of California attempt to suggest that their political role can even be spoken of in the same breath as that of the Blacks of Burke County, Georgia and Mobile, Alabama." Democratic Congressional Delegation's Memorandum in Support of Motion to Dismiss, at 26.

We are convinced that there is no credible way in which plaintiffs could amend their complaint to state a claim under *Davis v. Bandemer*, nor have they formally sought to do so. Therefore, plaintiffs' first cause of action is dismissed with prejudice.

## II. SECOND CAUSE OF ACTION

■ Plaintiffs' second contention is that A.B. 2X violates Article I, Section 2 of the Constitution, which provides:

The House of Representatives shall be composed of Members chosen every second Year by the People of the several States ...

Article I, Section 2 must be read in conjunction with Section 2 of the Fourteenth Amendment, which provides:

Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State ...

As interpreted by the Supreme Court, Article I, Section 2 prevents a State from creating congressional districts of unequal population. "The history of the Constitution, particularly that part relating to the

**6.** Plaintiffs complain that we are using judicial notice of facts to determine the ultimate issue, i.e., whether Republicans' political power has been unfairly diluted by A.B. 2X. They argue that such a determination is improper on a motion to dismiss. We note initially that when matters outside the pleadings are presented on a motion to dismiss, we may treat the motion as one for summary judgment under Rule 56. Fed.R.Civ.Pro. 12(b)(6). However, we do not view our uncontested judicial observations as a formal ruling under either Rule; we merely take notice of these facts as additional support for our ruling that plaintiffs need not be given any additional opportunity to amend.

adoption of Art. I, § 2, reveals that those who framed the Constitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to the basis of the House of Representatives." *Wesberry v. Sanders*, 376 U.S. 1, 9, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964). Accordingly, the Court has invalidated redistricting plans containing even minor population variances that were "not the result of a good-faith effort to achieve population equality." *Karcher v. Daggett*, 462 U.S. 725, 727, 103 S.Ct. 2653, 2656, 77 L.Ed.2d 133 (1983). In all of these cases, the Court has emphasized that "equal representation for equal numbers of people [is] the fundamental goal for the House of Representatives." *Wesberry*, 376 U.S. at 18, 84 S.Ct. at 535; *see also Karcher*, 462 U.S. at 730, 103 S.Ct. at 2658; *Kirkpatrick v. Preisler*, 394 U.S. 526, 530, 89 S.Ct. 1225, 1228, 22 L.Ed.2d 519 (1969).

Plaintiffs concede that A.B. 2X does not violate the equal population rule.[7] Thus, if Article I, Section 2 requires nothing more, then the motion to dismiss must be granted.

Plaintiffs' argument that Article I, Section 2 does require more is based on the statement from *Wesberry* that "the command of Art. I, § 2 ... means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." 376 U.S. at 7–8, 84 S.Ct. at 529–30. Seizing on the concept of "worth," plaintiffs argue that Republican votes in California are "worth" less than Democratic votes because A.B. 2X places Democratic majorities in a disproportionately large number of districts.

Plaintiffs' argument reads too much into *Wesberry*. The Supreme Court itself has recognized, albeit in dicta, that "population alone has been the sole criteria of constitutionality in congressional redistricting under Art. I, § 2 ..." *Mahan v. Howell*, 410 U.S. 315, 322, 93 S.Ct. 979, 984, 35 L.Ed.2d 320 (1973). The cases decided under Article I, Section 2, from *Wesberry* to the present, fully support such a conclusion. Indeed, the Court has even indicated a willingness to accept a certain amount of political maneuvering so long as the core constitutional concern—population equality—was protected:

> [The] argument that deviations from numerical equality are justified in order to inhibit legislators from engaging in partisan gerrymandering is no more than a variant of the argument, already rejected, that considerations of practical politics can justify population disparities.

*Kirkpatrick*, 394 U.S. at 534, 89 S.Ct. 1230. This reasoning is inconsistent with the notion that partisan gerrymandering is itself an Article I, Section 2 violation.

Our reading of *Kirkpatrick* is confirmed by *Karcher*, in which the court stated:

> *Kirkpatrick* does little to prevent what is known as gerrymandering. *Kirkpatrick*'s object, achieving population equality, is far less ambitious than what would be required to address gerrymandering on a constitutional level.

462 U.S. at 734 n. 6, 103 S.Ct. at 2660 n. 6 (citations omitted).[8]

Thus, the Court has made it clear that Article I, Section 2 only proscribes districts of unequal population. Claims regarding the political makeup of those districts must be judged by the more rigorous standards

---

**7.** As originally enacted, A.B. 2X did contain population variances which exceeded permissible limits, but Secretary of State Eu remedied that defect by making 21 administrative corrections to the plan. Plaintiffs have foregone their claim that these corrections were implemented in violation of state law.

**8.** Plaintiffs also rely on *Daggett v. Kimmelman*, 580 F.Supp. 1259 (D.N.J.), *aff'd mem.*, 467 U.S. 1222, 104 S.Ct. 2672, 81 L.Ed.2d 869 (1984), where the three-judge district court, in choosing a redistricting plan to replace the one struck down in *Karcher v. Daggett*, specifically declined to pick a plan which embodied "an intentional gerrymander in favor of certain Democratic Representatives." 580 F.Supp. at 1262. However, *Daggett* only involved the *remedial* stage of the litigation, *after* a violation of Article I, Section 2, had been found. The Court specifically stated: "[w]e need not consider how [the proposed plan] would have fared had it been validly enacted by the State of New Jersey." *Id.* Thus, *Daggett* cannot be read as holding that a partisan gerrymander, without more, violates Article I, Section 2.

of the Fourteenth Amendment, as outlined in *Davis v. Bandemer*. Accordingly, plaintiffs second cause of action must be dismissed.

## III. THIRD CAUSE OF ACTION

■ Plaintiffs' next contention is that A.B. 2X violates the First Amendment by "penalizing Republican voters solely because of their party affiliations, political beliefs and associations and by chilling public debate on issues of public importance."

It is well-settled that the "First Amendment protects political association as well as political expression." *Buckley v. Valeo*, 424 U.S. 1, 15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). However, plaintiffs have failed to explain *how* A.B. 2X penalizes the exercise of their First Amendment rights. Plaintiffs assert that A.B. 2X "negat[es] the effect of plaintiffs' votes and the votes of members of their party," but this claim ignores the fact that Republican votes were sufficiently effective to elect 18 Representatives.

Plaintiffs argue that this case is similar to the ballot-access cases, such as *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), in which the Court struck down restrictive election rules which effectively excluded independent and third-party candidates from the ballot. Those cases are inapposite to the instant situation. Plaintiffs here are not prevented from fielding candidates or from voting for the candidate of their choice. The First Amendment guarantees the right to participate in the political process; it does not guarantee political success.

Plaintiffs maintain that *Williams* protects the "right of qualified voters, regardless of political persuasion, to cast their votes *effectively*," 393 U.S. at 30, 89 S.Ct. at 10 (emphasis added), and that their votes are rendered ineffective in those districts where there is a Democratic majority. We reject this contention. As the Court stated

in *Bandemer*: "[a]n individual or a group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district.... This is true even in safe districts where the losing group loses election after election." 106 S.Ct. at 2810.[9] Although plaintiffs have generally alleged that Democratic incumbents "need [not] attend to the views of fragmented and submerged Republican minorities in their districts," they pointedly do not allege that Democratic representatives have in fact "entirely ignore[d]" the interests of those voters. *Id.*

Finally, the argument that A.B. 2X "chills" meaningful debate on political issues is wholly without merit. The concept of a "chilling effect" is associated with the doctrine of overbreadth, and describes the situation where persons whose expression is protected are deterred from exercising their rights by the existence of an overly broad statute regulating speech. *See, e.g., New York v. Ferber*, 458 U.S. 747, 768, 772 & n. 27, 102 S.Ct. 3348, 3360, 3362 & n. 27, 73 L.Ed.2d 1113 (1982). While plaintiffs may be discouraged by their lack of electoral success, they cannot claim that A.B. 2X regulates their speech or subjects them to any criminal or civil penalties for engaging in protected expression.

Plaintiffs have failed to allege a violation of their First Amendment rights. Accordingly, plaintiffs third cause of action must be dismissed.

## IV. FOURTH CAUSE OF ACTION

■ Plaintiffs' final contention is that A.B. 2X violates Article IV, Section 4 of the Constitution, which provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government ..."

This contention is easily dismissed on the authority of *Baker v. Carr*, 369 U.S. 186, 223–24, 82 S.Ct. 691, 713–14, 7 L.Ed.2d 663

**9.** Although *Bandemer* involved an equal protection challenge, the observation is equally applicable to a First Amendment claim. The Court in *Williams* noted the overlapping nature of the right to association and the right to vote. 393 U.S. at 30, 89 S.Ct. at 10.

(1962), and the cases cited therein. In *Baker*, the Court noted that it "has consistently held that a challenge to state action based on the Guaranty Clause presents no justiciable question." *Id.* at 224, 82 S.Ct. at 714. With respect to the reapportionment challenge before it, the Court specifically stated that "any reliance on [the Guaranty] clause would be futile." *Id.* at 227, 82 S.Ct. at 715. This result is not altered by *Bandemer*'s holding that an equal protection challenge to a partisan gerrymander is justiciable; *Baker* specifically distinguished the equal protection claim before the Court from the non-justiciable claims based on the Guaranty Clause.

Accordingly, plaintiffs fourth cause of action must be dismissed as presenting a non-justiciable question.

## CONCLUSION

The tortured history of this litigation is one of repeated attempts by the plaintiffs to frame a complaint which could withstand both a motion for abstention and a motion to dismiss. These repeated attempts have come to naught and have demonstrated that plaintiffs are unable to state a federal constitutional claim.

IT IS THEREFORE ORDERED that defendants' motion to dismiss plaintiffs' third amended complaint is GRANTED with prejudice.

ZIRPOLI, District Judge, concurring:

I must accept the Supreme Court's ruling "that political gerrymandering cases may properly be justiciable under the Equal Protection Clause." *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). Nevertheless, the factors that motivated gerrymandering in the present case are no more reprehensible than those found in *Bandemer*,[1] and do not constitute a threshold showing of discriminatory vote dilution required for a prima facie case of equal protection violation.

1. "Mr. Sussman: What were the political factors?

SCHNACKE, District Judge, dissenting:

I must respectfully dissent. A statement of my reasons will be filed in due course.

"Mr. Dailey: We wanted to save as many incumbent Republicans as possible." *Bandemer*, 106 S.Ct. at 2802, n. 5.