**REPUBLICAN PARTY OF VIRGINIA,** Virginia Fair and Impartial Redistricting, Joint Republican Caucus of the Virginia General Assembly, Thomas G. Baker, Jr., individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Barbara M. Stafford, individually and in her official capacity as a Republican delegate in the Virginia House of Delegates, Joyce K. Crouch, individually and in her official capacity as a Republican delegate in the Virginia House of Delegates, Charles R. Hawkins, individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Phoebe M. Orebaugh, individually and in her official capacity as a Republican delegate in the Virginia House of Delegates, Raymond R. Guest, Jr., individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Robert T. Andrews, individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Vincent F. Callahan, Jr., individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Richard L. Fisher, individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Jane H. Woods, individually and in her official capacity as a Republican delegate in the Virginia House of Delegates, Robert E. Harris, individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, James H. Dillard II, individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Robert D. Orrock, individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Harvey B. Morgan, individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Malfourd W. Trumbo, individually and in his official capacity as a Republican delegate in the Virginia House of Delegates, Andrew Hawkins, Philip Steele, Margarita Law, Nathan H. Miller, B.B. McKay, Mary Ellen McInnis, Arnold L. Larsen,

Jr., Patrick A. Rodio, Anthony P. Strande, Sally Quenneville, Shirley Duncan, Paul Hockman, Richard W. Henener, Jr., Ralph O. Tucker, Richard A. Claybrook, William Truban, John Marocchi, Plaintiffs,

v.

L. Douglas WILDER, in his official capacity as Governor of the Commonwealth of Virginia, Michael G. Brown, in his official capacity as Executive Secretary of the State Board of Elections of the Commonwealth of Virginia, Defendants.

Civ. A. No. 91–0424–R.

United States District Court,
W.D. Virginia,
at Roanoke.

Sept. 10, 1991.

Charles J. Cooper, Shaw, Pittman, Potts & Trowbridge, argued, Washington, D.C. (Michael A. Carvin, Thomas J. Catliota, Robert J. McAuliffe and Leslie Stout–Tabackman, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., and William B. Poff, Woods, Rogers & Hazlegrove, Roanoke, Va., on brief), for plaintiffs.

Gregory E. Lucyk, Sr. Asst. Atty. Gen., argued (Mary Sue Terry, Atty. Gen., H. Lane Kneedler, Chief Deputy Atty. Gen., Gail S. Marshall and K. Marshall Cook, Deputy Attys. Gen., Roger C. Wiley, Sr. Asst. Atty. Gen., Martha B. Brissette, Patrice B. Johnson, Todd E. LePage and Roscoe C. Roberts, Asst. Attys. Gen., Office of Atty. Gen., on brief), Richmond, Va., for defendants.

Before WIDENER, United States Circuit Judge, and MICHAEL and KISER, United States District Judges for the Western District of Virginia.

WIDENER, Circuit Judge, with whom Judges MICHAEL and KISER concur:

The Republican Party of Virginia, certain Republican members of the Virginia House of Delegates, and some voters registered in Virginia (Republicans) brought suit against the Governor and Executive Secretary of the State Board of Elections of the Commonwealth of Virginia, contending that the defendants participated in the enactment and enforcement of a partisan gerrymander which violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article II, Section 6 of the Virginia Constitution.

■ Subsequently, on August 16, 1991, the Republicans filed a motion for preliminary injunctive relief. The Republicans confined their motion to the claim that the First and Fourteenth Amendments were violated by pairing fourteen Republican House of Delegate incumbents against each other and one Republican incumbent against an independent incumbent.[1] In their motion for a preliminary injunction, the Republicans asked:

1. That the Court grant the Virginia General Assembly until the earlier of four days from entry of the Court's order, or to September 15, 1991, to enact redistricting legislation separating paired incumbent members of the House of Delegates in districts 98, 37, 7 and 15 under HB 3001.

2. That in the event that the General Assembly fails to enact such legislation within the specified time frame, the Court enter an order redrawing such districts as are necessary to separate paired incumbent members of the House of Delegates in districts 98, 37, 7 and 15 under HB 3001.

3. That the Court extend the September 11, 1991, deadline for filing party nominations in the affected districts until September 25, 1991.

We are of opinion that the Republicans have not met their burden of establishing that preliminary relief is warranted. Therefore, the motion for a preliminary injunction is denied.

## I. FACTS

In April 1991, the Virginia House of Delegates and Senate passed and Governor Wilder signed HB 3001, the redistricting plan for the House of Delegates.[2] At the time of the enactment of HB 3001, the Democrats had a majority in both the House (59 Democrats, 39 Republicans and 2 Independents) and Senate (30 Democrats and 10 Republicans). Governor Wilder is a Democrat.

HB 3001 paired 14 Republican incumbents with each other and one Republican incumbent with an independent. Only two Democrats, if any, J. Jack Kennedy and Clarence Phillips, were paired.[3]

Since the enactment of HB 3001, four of the paired Republican incumbents have announced their candidacy for the Virginia Senate and two of the paired Republicans have moved to open districts.[4] Therefore,

---

1. The Republicans allege that the independent incumbent, Lacey Putney, generally votes Republican.

2. The bill was signed by Governor Wilder as Chapter 11 of the 1991 Special Session on April 19, 1991.

3. Subsequent to the enactment of HB 3001, Kennedy was elected to the Senate to fill the seat left vacant by the death of Senator John Buchanan. Kennedy's election to the Senate was in a special election called by the Governor, who, however, did not call a special election to fill the vacancy in Kennedy's House seat caused by his running for the Senate. So any pairing of Democratic members of the House was quickly undone and left Phillips with the seat as an unpaired Democrat.

4. The following is a listing of the paired Republican incumbents:

| HB 3001 District | Delegate Name | Current Status |
|---|---|---|
| 7 | Barbara Stafford | Not running |
|  | Thomas Baker | Seeking reelection |
| 15 | Raymond R. Guest, Jr. | Seeking reelection |
|  | Phoebe Orebaugh | Not running |
| 19 | Malfourd Bo Trumbo | Running for Senate |
|  | Lacey Putney (Independent) |  |
| 22 | Charles Hawkins | Running for Senate |
|  | Joyce Crouch | Seeking reelection |
| 34 | Robert T. Andrews | Running for Senate |
|  | Vince F. Callahan, Jr. | Seeking reelection |

only two districts remain with paired Republican incumbents. In each of the two districts where a pair is still present, one of the incumbents has chosen not to run unless the pairing is undone. The two incumbents who have moved to open districts intend to return to their former residences if the pairing is removed. The individuals running for Senate seats do not seek affirmative injunctive relief.

## II. PRELIMINARY INJUNCTION STANDARD

Four factors are to be considered in determining if a preliminary injunction should be granted:

(1) the likelihood of irreparable harm to the plaintiffs if the preliminary injunction is denied,

(2) the likelihood of harm to the defendants if the requested relief is granted,

(3) the likelihood that the plaintiff will succeed on the merits, and

(4) the public interest.

*Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353 (4th Cir.1991).

### A. *Irreparable Harm to the Plaintiffs*

If the elections are held under the present redistricting plan, Barbara Stafford and Phoebe Orebaugh do not plan to run. Undoubtedly, they will lose their status as incumbents and whatever protecta-ble interest that may entail. However, under the Republican proposal for redistricting Mrs. Stafford would have been paired with a Democratic incumbent. Therefore, she faces opposition from an incumbent Democrat even if injunctive relief is granted. James H. Dillard and Robert D. Orrock have moved and are running as the sole incumbents in their new districts. Therefore, if they prevail in the November elections, they will maintain their status as incumbents.

### B. *Irreparable Harm to the Defendants*

If the injunction is granted the Commonwealth will incur considerable expense and labor in reconvening the General Assembly. In addition, the extension of filing deadlines for candidates will disrupt the statewide election schedule currently in place.

### C. *Likelihood of Success on the Merits*

In *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), the Supreme Court held that partisan gerrymandering cases are justiciable under the Equal Protection Clause of the Fourteenth Amendment.[5] 478 U.S. at 143, 106 S.Ct. at 2816. While a majority agreed that such claims were justiciable, there was no majority opinion as to the test for determining whether an equal protection violation had

HB 3001

| District | Delegate Name | Current Status |
| --- | --- | --- |
| 35 | Richard L. Fisher | Seeking reelection |
|  | Jane H. Woods | Running for Senate |
| 37 | James H. Dillard | Moved to Dist. 41 |
|  | Robert E. Harris | Seeking reelection |
| 98 | Harvey B. Morgan | Seeking reelection |
|  | Robert D. Orrock | Moved to Dist. 54 |

5. *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), involved the 1981 reapportionment of the Indiana state legislature. At the time the reapportionment was enacted the Governor was a Republican and majorities in both the House and Senate were Republican. 478 U.S. at 177–78, 106 S.Ct. at 2834. Several Indiana Democrats filed suit alleging that the reapportionment plan "constituted a political gerrymander intended to disadvantage Democrats" in violation of the Equal Protection Clause of the Fourteenth Amendment. 478 U.S. at 115, 106 S.Ct. at 2801. A divided three judge district court held that the reapportionment was unconstitutional and enjoined state officers from holding elections pursuant to the 1981 plan. *Bandemer v. Davis,* 603 F.Supp. 1479, 1495–96 (S.D.Ind.1984). The Supreme Court subsequently stayed the judgment of the district court, *Davis v. Bandemer,* 474 U.S. 991, 106 S.Ct. 402, 88 L.Ed.2d 354 (1985), and reversed the judgment of the district court, 478 U.S. 109, 106 S.Ct. at 2797.

occurred.[6] Therefore, we follow the plurality opinion because it provides the narrowest grounds for decision. *Badham v. March Fong Eu*, 694 F.Supp. 664, 668–69 (N.D.Cal.1988), aff'd, 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1988), citing *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).

■ To establish an Equal Protection violation in this, a partisan gerrymandering case, the Republicans must "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." 478 U.S. at 127, 106 S.Ct. at 2808.

For the purposes of this motion we are of opinion that the Republicans have proved that the Virginia legislature intended to discriminate against Republicans when it adopted HB 3001. As stated in *Bandemer*, "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." 478 U.S. at 129, 106 S.Ct. at 2809.[7] However, even if the district boundaries were drawn *solely* for partisan ends, which has not been proven here, that would not be, in and of itself, a violation of the Equal Protection Clause. 478 U.S. at 138–139, 106 S.Ct. at 2813.

To succeed on their claim, the Republicans must prove an actual discriminatory effect. 478 U.S. at 127, 106 S.Ct. at 2807. A *de minimis* effect is insufficient. 478 U.S. at 134, 106 S.Ct. at 2811. There must be "evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process." 478 U.S. at 133, 106 S.Ct. at 2810. There must be proof that the "challenged legislative plan has had or will have effects that are sufficiently serious to require intervention by the federal courts in state reapportionment decisions." 478 U.S. at 134, 106 S.Ct. at 2811. "[U]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole."[8] 478 U.S. at 132, 106 S.Ct. at 2810.

Prior to the Court's decision in *Bandemer*, two elections were held in Indiana under the 1981 plan. In both elections, the Democrats received a smaller percentage of legislative seats than the percentage of votes they garnered.[9] However, *Bandem-*

---

**6.** Justices White, Brennan, Marshall, Blackmun, Powell, and Stevens, held the claim to be justiciable. Justices White, Brennan, Marshall, and Blackmun, held that no unconstitutional discriminatory effects were shown as a matter of law. Chief Justice Burger, and Justices O'Connor and Rehnquist, concurred in the judgment, believing that the claim was not justiciable. Justices Powell and Stevens dissented, advocating the view that an equal protection violation had occurred. *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986).

**7.** The Republicans cite without refutation, other variables aside, a statistical analysis which shows that the random chance of all 15 paired

incumbents involving only Republicans is only 138 in one billion, some 10.54 standard deviations. Even if the Kennedy/Phillips district is considered a Democratic pair, the statistical chance of 15 out of 17 involving Republicans and no Democrats is almost as minimal, we suggest. See *Hazelwood School District v. United States*, 433 U.S. 299, 308–09, n. 14, 97 S.Ct. 2736, 2742, n. 14, 53 L.Ed.2d 768 (1977), which stated that upon two or three standard deviations "... then the hypothesis that teachers were hired without regard to race would be suspect."

**8.** The plurality recognized that making this determination "is of necessity a difficult inquiry." 478 U.S. at 143, 106 S.Ct. at 2815.

**9.** Following are the election results in Indiana's state races:

| Year | Legislative Body | Political Party | Percentage of Votes* | Number of Seats |
|------|------------------|-----------------|----------------------|-----------------|
| 1982 | Senate** | Democrats | 53.1 | 13 |
| | | Republicans | 46.9 | 12 |
| | House | Democrats | 51.9 | 43 |
| | | Republicans | 48.1 | 57 |

*er* held that a mere lack of proportionate results in an election is insufficient to prove that a redistricting has disadvantaged a political party at the polls. 478 U.S. at 139, 106 S.Ct. at 2813. The Court concluded that this evidence was insufficient to establish an equal protection violation.

In the case at hand, no election has occurred. The only apparent effects of the redistricting on the Republicans are that four House members have decided to run for Senate seats, two House members have moved to open districts where they each will be the sole incumbent running, and two House members have chosen not to engage in nomination contests against fellow Republican House members. We doubt that this is sufficient evidence, especially at this stage of the case, to establish that the "electoral system has been 'arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole.' " 478 U.S. at 142–43, 106 S.Ct. at 2815. Faced with the Court's rejection of the *Bandemer* plaintiffs' more convincing evidence, we cannot say that the Republicans have a sufficient likelihood of success on the merits of this claim to authorize the issuance of a preliminary injunction.

The Republicans seek, however, to distinguish their case from *Bandemer*. They claim that *Bandemer* was a vote dilution case, while the instant case involves pairing. We find it difficult to see any substantive distinction between the two. The purpose of a partisan gerrymander is to arrange district lines so as to obtain as many seats as possible for the majority party and as few as possible for the minority party. Whether it is done by pairing members of the minority party together, as was done here, or by collecting minority votes to create supermajority minority districts, as was done in *Bandemer*, the effect is the same; the majority increases its strength in the legislature relative to what it would achieve in the absence of partisan gerrymandering.

In a further attempt to distinguish the *Bandemer* decision, the Republicans assert that pairing incumbent Republican legislators in the same district for partisan political reasons constitutes a violation of those legislators' personal rights under the First and Fourteenth Amendments. The Republicans also claim that such pairing burdens voters' freedom of association and infringes the Republican Party's right to select its candidates.

The court in *Badham v. March Fong Eu*, 694 F.Supp. 664 (N.D.Cal.1988), aff'd, 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962, dismissed a similar claim. In *Badham*, individual Republican Congressmen and voters alleged that the redistricting in that case violated the First Amendment by "penalizing Republican voters solely because of their party affiliations, political beliefs and associations." 694 F.Supp. at 675. In *Badham*, as in the case before us, the Republicans argued that their case was similar to the ballot access cases in which the Supreme Court struck down restrictive election rules which effectively burdened independent and third party candidates in obtaining a place on the ballot. *Badham* at 675, citing *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) and *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). The *Badham* court found that those cases did not support the Republicans' claim because the Republicans were not prevented from fielding candidates or from voting for the candidate of their choice. 694 F.Supp. at 675. The same is true in the instant case. The

| Year | Legislative Body | Political Party | Percentage of Votes* | Number of Seats |
|------|-----------------|-----------------|----------------------|-----------------|
| 1984 | Senate** | Democrats | 42.3 | 7 |
|      |          | Republicans | 57.7 | 18 |
|      | House | Democrats | 44 | 39 |
|      |       | Republicans | 56 | 61 |

*Percentages are approximate.

**25 of the Indiana Senate's 50 members are elected every two years.
478 U.S. at 182–83, 106 S.Ct. at 2836–37 (Powell, J., dissenting).

Republicans are free to field any candidate they wish, and Republican voters can vote for the candidate of their choice. In addition, the ballot access cases did not arise in the context of redistricting. The Supreme Court has stated that standards are different in the context of a redistricting. See, e.g. *Bandemer*, 478 U.S. at 134 n. 14, 106 S.Ct. at 2811 n. 14 ("The requirement of a threshold showing is derived from the peculiar characteristics of these political gerrymandering claims. We do not contemplate that a similar requirement would apply to our Equal Protection cases outside of this particular context.") "[I]nviting attack on minor departures from some supposed norm would too much embroil the judiciary in second-guessing what has consistently been referred to as a political task for the legislature...." 478 U.S. at 133, 106 S.Ct. at 2811. In light of *Badham* and the other precedent, we can not say that the Republicans have such a likelihood of success on the merits of this claim that the issuance of a preliminary injunction is required.

In another approach to establishing the infringement of a personal First Amendment right, the Republicans, relying on *Rutan v. Republican Party of Illinois,* — U.S. ——, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) and *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976), argue that "[s]ince the government cannot force an individual to choose between civil service employment and taking an action contrary to his chosen political affiliation, it follows *a fortiori* that it may not require such a sacrifice of those seeking an elected office."

In *Elrod*, employees of the Cook County, Illinois, sheriff's department brought suit alleging that they were discharged or threatened with discharge solely because they were not affiliated with the Democratic Party. 427 U.S. at 350, 96 S.Ct. at 2678. The Supreme Court held in their favor, stating that "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments" because it "severely restricts political belief and association." 427 U.S. at 372–73, 96 S.Ct. at 2689. In *Branti v. Finkel,* 445 U.S. 507, 519, 100 S.Ct. 1287, 1295, 63 L.Ed.2d 574 (1980), the Supreme Court, in holding that "the continued employment of an assistant public defender cannot properly be conditioned upon his allegiance to the political party in control of the county government" made clear that "party affiliation may be an acceptable requirement for some types of government employment." 445 U.S. at 517, 100 S.Ct. at 1294. "[T]he question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." [10] 445 U.S. at 518, 100 S.Ct. at 1295.

At least three determinations must be made in favor of the Republicans before *Elrod, Branti,* and *Rutan* could be extended to the present case. First, it must be determined that the defendants are equated to the "hiring authority"; and, second, that party affiliation is not "an appropriate requirement for the effective performance of" a member of the House of Delegates. Both decisions would require major leaps from present case law and nothing in the *Elrod* line of cases indicates that the Supreme Court intended that the election of state legislators should be protected from the effects of a partisan gerrymander. Third, it must be determined that *Davis v. Bandemer* does not control the case.

The position advocated by the Republicans comes close to the requirement of adopting, in essence, a per se rule that the pairing of a disproportionate number of minority party incumbents is a constitutional violation.[11] We are aware of no court that has adopted this view. While it may be true that a burden has been placed on these eight Republican incumbents which

---

**10.** *Rutan* extended the rule in *Elrod* and *Branti* to promotion, transfer, and rehiring decisions based on party affiliation. —— U.S. at ——, 110 S.Ct. at 2738.

**11.** Resolution No. 1 of the House of Delegates Privileges and Election Committees, under which resolution the redistricting was conducted, provided in part: "D. Existing Districts; Incumbency. It is permissible to consider existing districts and incumbency."

has not been similarly visited upon their Democratic colleagues, the Court has explicitly rejected the view that *"any* interference with an opportunity to elect a representative of one's choice" establishes an Equal Protection violation. *Bandemer,* 478 U.S. at 133, 106 S.Ct. at 2811. (Italics are the Court's.)

Thus, while we do not presently foreclose the Republicans' pairing claims, we do not believe that their chance of success on the merits of their claim is sufficient to require the issuance of a preliminary injunction.

### D. *The Public Interest*

The court in *Cosner v. Dalton,* 522 F.Supp. 350 (E.D.Va.1981), held the 1981 reapportionment plan for the House of Delegates to be unconstitutional. However, in its order entered August 25, 1981, it allowed the elections scheduled for the following November to take place under the invalidated plan because it "believe[d] that a strong and representative turnout for the House election depend[ed] on holding it on [the date of the general election in November]." 522 F.Supp. at 364. The court considered redrawing the map itself or giving the legislature time to redraw the districts, but felt that either method would result in a delay in the election. 522 F.Supp. at 363–64.

In the instant case, a hearing and oral argument on the Republicans' motion for preliminary injunction was held on September 3, 1991. Therefore, we are presently closer to the November general election than was the *Cosner* court when it entered its order.

Any legislative change in district lines would have to be submitted for preclearance under the Voting Rights Act. Therefore, it would not be unlikely that if the Republicans' motion were granted, the House elections could not proceed as scheduled. As in *Cosner,* we believe there is a strong public interest in holding the House elections at the same time as the general election in November. Otherwise, low voter turnout might well occur. Just as importantly, we believe the public interest favors an electorate familiar with its candidates and elections conducted in an orderly way within easily understood boundaries. While the action of the General Assembly in splitting political subdivisions and voting units does not commend itself to clarity, or even to fidelity to P & E Resolution No. 1, a rush to reorganize can only increase confusion brought about by redistricting, a part of which, at least, is caused by statutory requirements such as the Voting Rights Act.

In *Cosner,* a plan, although found to be unconstitutional, was allowed to be implemented. We believe that HB 3001, not presently held invalid, should be accorded the same treatment.

### III. CONCLUSION

In balancing the harm to the parties, we find that the two members of the House of Delegates who were able to move and run as incumbents have suffered no irreparable harm so far as there may be a protectable interest in incumbency. It is true that they suffered the burden of moving, a burden not suffered by any of their Democratic colleagues. Phoebe Orebaugh and Barbara Stafford, so far as there may be any protectable value in incumbency, have been irreparably harmed by a loss of their seats as well as their incumbency, a burden not shared by any of their Democratic colleagues. To say that they do not have this burden, that it might be visited on Delegates Andrews and Guest, is nothing more than the opposite side of the same coin. The detriment is still there.

The principal harm we can foresee to the defendants is disturbing the electoral process by giving preliminary relief in a case such as this in the face of a cause of action, the existence of which is uncertain, at best. We do not believe that a redistricting plan, which has been entrusted to the Commonwealth, by law, and especially to the General Assembly and the Governor thereof, should be upset in the face of an uncertain cause of action with only possible irreparable harm to eight members of the General Assembly. This is not the kind of action which would make it presently seem likely that there will be "evidence of continued

frustration of the will of the majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process." 478 U.S. at 133, 106 S.Ct. at 2811. We think the balance of harm does not weigh in favor of the plaintiffs.

Accordingly, an order of even date will be entered denying the Republicans' motion for a preliminary injunction.