Peter **HOLLOWAY, David Tyson, Chester L. Wollard, Marie Wollard, Mary Ann Osborne, T. David Higgins, Cary A. King and Opie Rollyson, Plaintiffs,**

v.

Ken **HECHLER, Secretary of State of the State of West Virginia, Robert "Chuck" Chambers, Speaker of the West Virginia House of Delegates, and Keith Burdette, President of the West Virginia Senate, Defendants.**

Civ. A. No. 2:92–0081.

United States District Court, S.D. West Virginia, Charleston.

Sept. 29, 1992.

John N. Charnock, Jr., Charnock & Charnock, Charleston, WV, for plaintiffs.

Michael J. Basile, Asst. Atty. Gen., Richard L. Gottlieb, Office of Atty. Gen., Charleston, WV, for defendant Ken Hechler.

M.E. Mowery, House Judiciary Committee, Michael Crane, Senate President's Office, Alison E. Patient, WV House of Delegates, House Finance Committee, Charleston, WV, for defendants Robert C. Chambers and Keith Burdette.

Before K.K. HALL, Circuit Judge, HADEN, Chief District Judge, and STAKER, District Judge.

## MEMORANDUM OPINION

STAKER, District Judge.

In this action plaintiffs challenged the constitutionality of Senate Bill 1 (S.B. 1), and House Bill 4043 (H.B. 4043), which were respectively enacted by the Legislature of the State of West Virginia (Legislature) on December 3, 1991 and January 13, 1992, and reapportioned the electoral districts for the Senate and the House of Delegates (Delegate) seats of the Legislature, effective beginning with the elections to be had in the State in the year 1992.

This court has jurisdiction hereof pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367 and 2284.[1]

---

1. Pursuant to 28 U.S.C. § 2284, the Honorable Samuel J. Ervin, III, Chief Judge of the Fourth

An order was entered by the court notifying the parties that on February 26, 1992, the court would hear all evidence and arguments any of them desired to offer regarding all issues pending herein. All of the parties appeared by counsel thereat and the court there heard all of the evidence and arguments presented by them, following which, on February 26, 1992, the court entered its order in which, for the reasons therein set forth, the injunctive relief prayed for by the plaintiffs was denied and their complaint was dismissed insofar as it averred the unconstitutionality of S.B. 1.

However, as stated in that order, the court then declined to rule upon the issue of the alleged unconstitutionality of H.B. 4043 pending the court's further consideration thereof, which remains as the only issue to be decided herein.

The reapportionment act enacted next before the enactment of H.B. 4043, was known as "The House of Delegates Apportionment Act of 1982" (1982 Act), and was codified as West Virginia Code (Code), § 1–2–2. H.B. 4043, also codified as Code, § 1–2–2, amended and reenacted the 1982 Act, pursuant to Article 6, section 7, of the Constitution of West Virginia, which requires the State's Delegate districts (hereinafter, "districts") to be reapportioned following each decennial census of the United States. H.B. 4043 fixed at 100, as did the 1982 Act, the number of Delegates to be elected from the districts thereby apportioned among the State's 55 counties. Article 6, section 4, of that Constitution provides that members of the House of Delegates shall be elected every two years.

*The Complaint*

Plaintiffs allege that they are all citizens, residents and registered voters in West Virginia, one of them respectively being such in each of Ohio, Cabell and Berkeley, two others in Kanawha, and the remaining three in Wood, Counties in West Virginia.

It is not disputed that the named defendants are joined as such in their respective official capacities, as indicated in the above style of this action.

The thirty-one page complaint alleges five causes of action in which plaintiffs assert H.B. 4043 to be unconstitutional pursuant to different provisions of the Constitution of the United States.

The first three causes are interrelated and allege that H.B. 4043 is in violation of the rights guaranteed plaintiffs by the provisions of section 1 of the Fourteenth Amendment to the United States Constitution,[2] which plaintiffs claim require that their votes, as well as those of all other citizens of the State, have an equal effect and worth in the electoral processes for the election of Delegates in future State elections. Those causes more specifically allege:

*First Cause*

This cause alleges, and defendants admit, that the most overpopulated Delegate district created by H.B. 4043 has a relative deviation of 4.97 per cent greater, and the most underpopulated one has a relative deviation of minus 5 per cent less, than the "ideal" populations of them, respectively.[3]

It further alleges that the districts in which plaintiffs are registered to vote, as created by H.B. 4043, were respectively de-

Circuit Court of Appeals, entered an order herein on February 12, 1992, designating Judge Kenneth K. Hall, Judge of that court, and Chief Judge Charles H. Haden II and Judge Robert J. Staker, both District Judges in this district, to preside herein as a three-judge court.

**2.** *Section 1 of the Fourteenth Amendment provides:*

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor

deny to any person within its jurisdiction the equal protection of the laws.

**3.** The first cause further alleges that H.B. 4043 includes 41 seats which are in excess of four percent greater or less than the "ideal" population, 32 districts which are in excess of three percent greater or less than that ideal, five seats which are in excess of two percent greater or less than that ideal, and 13 seats which are in excess of one percent greater or less than that ideal, and that only nine of the 100 seats are within one percent of that ideal. The defendants deny this allegation.

signed by the Legislature to be either unconstitutionally overpopulated or underpopulated vis-a-vis the populations in them respectively and the populations in other districts created thereby, and in the State as a whole, which will cause votes cast by plaintiffs for the elections of Delegates to be diluted, and of unequal effectiveness and worth, as compared with those cast therefor by other voters in the State.

And it alleges that H.B. 4043 unconstitutionally creates two so-called "proviso" districts, both of which are advantageous to incumbent Delegates therein. The specifics of this allegation are more fully stated and discussed below.

## Second cause

This cause in substance incorporates the same allegations as those made in the first and third ones, but in addition thereto, it alleges that in enacting H.B. 4043, the Democratic leadership in the Legislature used multi-member districts to maintain their power by fragmenting portions of adjacent counties which were sufficiently large to elect candidates of their choice in single-member districts for the purpose of minimizing the voting strength in those districts.

## Third Cause

Here plaintiffs allege that H.B. 4043 apportions 100 Delegate seats among 23 multi-member districts and 33 single-member districts for the purpose of maximizing Democratic, and minimizing Republican, political and electoral strength, which result would have been avoided had H.B. 4043 redistricted the State into 100 single-member districts, and that its enactment constitutes invidious, partisan gerrymandering to discriminate against Republican voters, including the plaintiffs, by diluting, minimizing and cancelling out their voting and political strength and that of other Republican voters in given districts as well as in the State as a whole.

Except in the particulars above noted, the defendants' answers substantially deny the allegations in plaintiffs' causes.

## The Evidence

Aside from maps and related documentary evidence showing the districts created by H.B. 4043, etc., plaintiffs' evidence consisted of the testimony of seven witnesses, the substance of which was as follows:

*John Morgan*—a "political demographer":

The counties in the southern part of the state in which H.B. 4043 created districts containing population less than the "ideal" had lost, and those in the Eastern Panhandle thereof in which it created districts containing population exceeding the "ideal" had gained, population since the 1980 census. He opined, but conceded that he did so with no assurance, that such trend would continue during the 1990's and that should the 26 incumbent Republican Delegates now serving in the Legislature stand for election in 1992, one-third to one-fourth of them would be replaced by Democrats in consequence of the redistricting effected by H.B. 4043.

*Chris Larsin*—Director of Redistricting Analysis for the Republican National Committee:

The Legislature could have devised, in lieu of H.B. 4043, a redistricting plan which would have created 100 single-member districts with zero population variances; however, his testimony did not explain or comprehend how such could have been accomplished.

*Charlotte Lane*—a Republican and one of twelve Delegates elected at large in 1990 from Kanawha County, which then consisted of one, multi-member district:

During 1991–92, she served on the House Select Committee for Redistricting of the State's Delegate districts. The Chairman thereof favored reapportionment of the State into 100 single-member districts, but stated that he would permit the delegates serving from each district, as they were apportioned by the 1982 Act, to pretty much decide how their district would be reapportioned. Notwithstanding that all of Kanawha County's twelve incumbent delegates had strongly favored the reapportionment's leaving Kanawha County as one, multi-member district, H.B. 4043 divided Kanawha County into three separate districts, including District 30, in which all of the incumbent Republican

Delegates resided, but which also included the predominantly registered Democratic "Cabin Creek" area, as a result of which the political strength of those four incumbents, which had theretofore been county-wide, would be confined to District 30 only and would be diluted by the voters in the Cabin Creek area who traditionally voted straight democratic for the most part.[4]

*Evelyn E. Richards*—a Republican and one of six incumbent delegates elected at large in 1990 from the district created by the 1982 Act, which included all of Cabell and a small part of Wayne Counties:

For the most part, her constituency in 1990 consisted of voters in the urban portions of that district, but that H.B. 4043 had purposely drawn the lines of District 15 to include her residence therein, located at the extreme edge thereof, and to include more rural areas of a part of Cabell County, and like areas in five precincts in Lincoln County, all of which contain a predominance of registered democratic voters who traditionally

**4.** Under the 1982 Act, Kanawha County itself constituted one district which elected twelve delegates who ran at large.

In redistricting Kanawha County, H.B. 4043 created District 29, which includes a part of Kanawha, Greenbrier, Nicholas and Raleigh, and all of Fayette, Counties, and elects three delegates, and Districts 30, 31 and 32, each of which includes a part of Kanawha County only, and which respectively elect seven, one and four delegates.

That District 31 embraces a portion of the City of Charleston, in Kanawha County, in which blacks constitute about one-third of the population, and was created for the purpose of providing that black minority the opportunity more effectively to participate in the election of the one delegate to be elected from that district. Plaintiffs voice no objection to its creation.

**5.** Under the 1982 Act, all of Cabell and a part of Wayne Counties constituted a district which elected six delegates who ran at large.

H.B. 4043, created District 15, which includes parts of Cabell and Lincoln Counties, and District 16, which includes parts of Cabell and Wayne Counties, each of which elects three delegates.

The defendant Chambers, called as a witness by the defendants, testified that he told the Cabell county delegation, which included Delegate Evelyn Richards, to present a plan for its reapportionment, all of them agreed to support a plan that had no more incumbents than there were seats to fill, such a plan was devised which divided Cabell County into two multi-member

vote straight democratic, and that "they [the Legislature] knew that when they did it."[5]

*Greg Martin*—a Republican incumbent elected at large in 1990, from a district which then included a part of Ohio County:

H.B. 4043 reapportioned Ohio County into districts, including the district in which he resides, from which one Delegate is to be elected, and included therein a part of Brooke County, containing some 12,500 population, in which the voters traditionally vote for only Brooke County residents and straight democratic, which circumstance renders it all but impossible for a Republican residing in Ohio County, as does he, to be elected from that district, for which reason he did not file to run as a candidate for Delegate in 1992 therefrom. He conceded that the Delegate who moved in the House Select Committee on Redistricting in 1991–92, that H.B. 4043 establish a two-member district in Ohio County was Republican Delegate David McKinley.[6]

districts, each of which elected three delegates, and in each of which three incumbent delegates resided, after which Delegate Richardson informed him that she believed she could devise a better plan, and he told her to do so and submit it to the other Cabell County delegates for their consideration, and she chose not to do so. He further testified that H.B. 4043 placed the district in which he was required to run for reelection in 1992 in the same district as that in which Delegate Richards will be required to do so, and in so doing caused him to lose from his former constituency an area in which he had attended school, had many past associations and friends and had run quite well in past elections, and that the new district created by H.B. 4043 in which both he and Delegate Richards now live is much more likely to support a Republican candidate than it is a Democratic one. Other testimony of Mr. Chambers is summarized hereafter in the body of this opinion.

**6.** Under the 1982 Act, District 2, which elected two delegates, included parts of Ohio and Hancock, and all of Brooke, Counties, and District 3, which elected three delegates, included the remainder of Ohio, and a part of Marshall, Counties.

H.B. 4043, created District 2, which includes parts of each of Brooke and Ohio Counties, and elects two delegates; District 3, which includes a part of Ohio County, and elects two delegates; and District 4, which includes Marshall County and the remaining part of Ohio County and elects two delegates.

*David McKinley*—a Republican incumbent with twelve years' service as a Delegate, and who had served as Chairman of the Republican State Executive Committee for the last two years and was last elected in 1990 as a Delegate from a district created by the 1982 Act that included a part of Ohio County:

H.B. 4043 has had a chilling effect on finding Republican candidates to run for the office of Delegate, which was particularly true in respect to the district which includes the part of Ohio County in which Delegate Greg Martin resides.

He, Mr. McKinley, offered the amendment above referred to in order to combine what were proposed as Districts 4 and 5 in Ohio County into a two-member district so that he and Gill White, another incumbent, could run together therein.

A Republican was elected as President of the United States in 1968, 1972, 1980 and 1984, and in 1968, 1972 and 1984 a Republican was elected Governor of West Virginia. In the last sixty years the Republicans have never had control of the Senate or the House of Delegates in West Virginia.

Since he did not reside in the two-member district in Ohio County created by H.B. 4043 that contained the constituency which had elected him in 1990, in order for him to file to run as a Delegate therein, while living outside thereof, he brought an action in mandamus in the Supreme Court of Appeals of West Virginia, which held that he could lawfully do so if he moved his residence thereto, notwithstanding that he was not yet a resident thereof.[7]

*Robert Burk*—Republican incumbent Delegate from Wood County and a member of the House Select Committee on Redistricting:

Before H.B. 4043 was enacted, Wood and Wirt Counties constituted a multi-member district in which five Delegates ran at large. H.B. 4043 divided that district into three new districts, two of which were single-member ones and the third a multi-member one which

elected three delegates. One incumbent delegate resides in one, and two incumbent delegates reside in the other, of the two single-member districts, and two incumbents reside in the multi-member district. He filed as a candidate in 1992 in the multi-member district in which he does not now reside but to which he intends to move his residence.

At the close of the plaintiffs' evidence, the defendants moved that the complaint be dismissed and judgment entered in their favor. The court then took that motion under advisement.

The defendants presented two witnesses who testified, in substance, as follows:

*David A. Ellis*—a person with expertise in the use of computers, who was employed by the Office of Legislative Services of the Legislature since May, 1989, and was assigned to serve the Select Committee on Redistricting of the House of Delegates:

The Chairman thereof informed him early on that he favored that the reapportionment create single-member districts throughout the State, but directed him to work with other Delegates to develop plans they found to be favorable to them.

The initial redistricting plan submitted by him to the Committee comprehended the creation of 100 single-member districts, but to spur debate, different permutations of the area covered by all districts were prepared by the use of a computer and submitted to the Committee. In doing his work for the Committee, he was instructed not to use political data for the purpose of devising any redistricting plan. All delegates serving in the Legislature were invited to come to his office and show him exactly where they lived so that they could be shown the district in which their residences would be located in any of the redistricting plans.

*Robert C. Chambers*—Speaker of the West Virginia House of Delegates and one of the defendants:

---

**7.** *See Greg D. Martin, et al. v. Carole Jones, Circuit Clerk of Wood County, et al.* 186 W.Va. 684, 414 S.E.2d 445 (1992), in which the court held and said:

> In those cases in which a person moves to a new district, a part of which was his old dis-

> trict, after a legislative reapportionment occurring so close to election day that less than a year remains before the general election, the residency requirement of *W.Va. Const.*, Art. VI, § 12 has been met.

He did not advocate single-member districts throughout the State, because to do so made little sense to him; however, he believed that the Kanawha County district (a multi-member one which elected twelve delegates under the 1982 Act) and the Cabell County district (a multi-member one which included all of Cabell and a small part of Wayne Counties, and elected six delegates under the 1982 Act) constituted multi-member districts which were larger than they should be, and each should be divided into more than one district, but that he felt he could not recommend breaking Kanawha County into more than one district without making the same recommendation as to Cabell County.

Neither the plaintiffs, nor understandably the defendants, offered or presented in evidence any alternate redistricting plan or scheme that might be substituted in lieu of that created by H.B. 4043, or any facts, figures or data, geographical, demographical, or otherwise, from which any such alternate redistricting plan might be devised by the court should it find and hold H.B. 4043 to be unconstitutional.

Discussion and Conclusions of law as *to the First, Second and Third causes:*

*Malapportionment–Vote dilution issue*

In *Cosner v. Dalton,* 522 F.Supp. 350, 357–58 n. 11 (E.D.Va.1981), the court pointed out that

With respect to the lower end of the range of population variance, the Court has indicated that a deviation of less than 10% is prima facie constitutional. *White v. Regester,* 412 U.S. 755, 775, 93 S.Ct. 2332, 2344, 37 L.Ed.2d 314 (1973) (9.9%); *Gaffney v. Cummings,* 412 U.S. 735, 751, 93 S.Ct. 2321, 2330, 37 L.Ed.2d 298 (1973) (7.83%).

■ Accordingly, defendants' admission as fact plaintiffs' allegation that the most overpopulated district created by H.B. 4043 has a relative deviation of 4.97 per cent greater, and the most underpopulated one a relative deviation of minus 5 per cent less, than the "ideal" population, may result in the votes cast in the election of delegates by any of the plaintiffs or some other voters in the State to have, at the most, a total of 9.97 per cent more, on the one hand, or less, on the other, effectiveness and worth, as compared with votes cast for or against them by still some other voters in the State, and thus result in the dilution of any of such votes cast to the extent of that 9.97 percentage figure, does not *prima facie* establish H.B. 4043 to be unconstitutional under the provisions of section 1 of the Fourteenth Amendment.

The plurality in *Davis v. Bandemer,* 478 U.S. 109, 131–32, 106 S.Ct. 2797, 2809–810, 92 L.Ed.2d 85, 104–05 (1986), stated:

In cases involving individual multi-member districts, we have required a substantially greater showing of adverse effects than a mere lack of proportional representation to support a finding of unconstitutional vote dilution. Only where there is evidence that excluded groups have "less opportunity to participate in the political processes and to elect candidates of their choice" have we refused to approve the use of multi-member districts.... In these cases, we have also noted the lack of responsiveness by those elected to the concerns of the relevant groups.

These holdings rest on a conviction that the mere fact that a particular apportionment scheme makes it more difficult for a particular group in a particular district to elect the representative of its choice does not render the scheme constitutionally infirm. This conviction, in turn stems from a perception that the power to influence the political process is not limited to winning elections. An individual or a group of individuals who votes for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district. We cannot presume in such a situation, without actual proof to the contrary, that the candidate elected will entirely ignore the interests of those voters. This is true even in a safe district where the losing group loses election after election. Thus, a group's electoral power is not unconstitutionally diminished by the simple fact of an apportionment scheme that makes winning elections more difficult, and a failure of

proportional representation alone does not constitute impermissible discrimination under the Equal Protection Clause. See *Mobile v. Bolden*, 446 U.S. [55], at 111, n. 7, 64 L.Ed.2d 47, 100 S.Ct. 1490[, at 1523, n. 7] (Marshall dissenting).

(Citations and footnote omitted.)

In *Badham v. March Fong Eu*, 694 F.Supp. 664, 669 (N.D.Cal.1988), aff'd, 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989), the court stated that it followed "the plurality opinion [in *Bandemer* ], because it provides the narrowest grounds for decision," and in so doing quoted from *Bandemer* the paragraph last quoted next above.

### Multi-member districts issue

■ As to the vice, alleged in the third cause of the complaint, of H.B. 4043's having created some multi-member districts rather than 100 single-member ones, the court would point out that, as shown by the excerpts from the *Badham* decision quoted above, the Court there did not condemn the creation or existence of multi-member districts. Multi-member districts have been held not to be unconstitutional *per se*, *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).[8] *See also Simkins v. Gressette*, 631 F.2d 287, 291 (4th Cir.1980) ("[t]he authorities do not interdict multi-member districts.").

### Proviso districts issue

■ The first cause alleges that H.B. 4043 is unconstitutional because it creates two so-called "proviso" districts. There, plaintiffs point out that in elections conducted in multi-member districts, the candidates run at-large and are typically ranked according to the number of votes they respectively receive, and if there are four delegates to be elected in a given multi-member district, consisting of all or a part of more than one county, and that district is not a proviso district, then the four delegates who receive the highest number of votes in that district are elected; however, plaintiffs assert that if that same district is a proviso district, that is, if a statutory proviso applies thereto which provides that not more than three of those four delegates to be elected therefrom may reside in any given county therein, and four delegate candidates residing in one of the counties therein receive the highest number of votes, then the one of them who receives the fourth highest number of votes will not be elected; rather, in that circumstance, a candidate who resides in another county therein and who receives the fifth highest number of votes in that district will be elected, and plaintiffs claim that when such occurs, a majority of voters in that district are denied the right to elect the candidate of their choice, i.e., the candidate who received the fourth highest number of votes.[9]

No evidence whatever was presented by plaintiffs or any of the defendants bearing upon this "proviso" issue. It was only mentioned by counsel in oral argument at the trial hereof at which time plaintiffs' counsel were requested to present to the court any authority they could in support of their allegation that the two proviso districts in H.B. 4043 were unconstitutional, and they then had none, nor have they since presented any. Counsel for the defendants Chambers and

---

8. Moreover, there is Constitutional precedent for the existence of both single-member and multi-member districts in West Virginia. Article 6, sections 8 and 9, of the Constitution of the State of West Virginia, ratified in 1872, established the first delegate districts in the State, all to exist until the next census conducted under the authority of the United States, five of which were multi-member districts, two of them consisting of a single county, and the others consisting of two or more counties, and the remainder of them consisting of single-member districts.

9. The 1982 Act provided for eight proviso districts. The only two proviso districts created by H.B. 4043 are district 20, which elects four delegates and consists of parts of Logan, Lincoln and Boone Counties, and district 27, which elects five delegates and consists of parts of Raleigh and Summers Counties. H.B. 4043 provides, as to district 20 that no more than three, and as to district 27 that no more than four, delegates may be nominated, elected or appointed who are residents of any single county within those districts respectively. The remaining parts of Logan, Lincoln and Boone Counties, not included in proviso district 20, and of Raleigh and Summers Counties, not included in proviso district 27, are all included in other non-proviso districts.

Burdette likewise indicated that their research had failed to reveal any such authority.

Plaintiffs' claim that the proviso districts here are unconstitutional closely parallels the one made by the appellees in *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). There, a Georgia statute apportioned the state's 54 senatorial seats among 54 senatorial districts drawn along existing county lines, with no mathematical disparity, and provided that where there was more than one district in a county, all of the county's senators would be elected by a county-wide vote. Thirty-three of those districts included from one to eight counties each, and the voters therein elected their senators by a district-wide vote. However, the remaining 21 of those districts were allotted in groups of from two to seven among the seven most populous counties, but voters in those 21 districts did not elect a senator by a district-wide vote, but rather joined with the voters of the other districts of the county in electing all of the county's senators by a county-wide vote.

The appellees, registered voters of Georgia, sued in the federal District Court seeking a decree that the requirement of county-wide voting in the seven multi-district counties violated the Equal Protection Clause of the Fourteenth Amendment. A three-judge court granted summary judgment in their favor, holding that the statute accorded different treatment to the voters in the 33 districts, as compared with those in the 21, in that those in the 33 were allowed to select their senators and those in the 21 were not, for which reason those in the 21 suffered invidious discrimination.

On direct appeal, the Supreme Court reversed the District Court, holding that it could not say that the county-wide voting in the seven multi-district counties resulted in denying their voters a vote approximately equal in weight to that of voters in the single-member constituencies, and that appellees' claim that the scheme was defective because county-wide voting in multi-district counties could, as a matter of mathematics,

result in the nullification of the unanimous choice of the voters of a district, thereby thrusting upon them a senator for whom no one in the district had voted, was only a highly hypothetical assertion that, in any event, ignored the practical realities of representation in a multi-district constituency, because

> It is not accurate to treat a senator from a multi-district county as the representative of only that district within the county wherein he resides. The statute uses districts in multi-district counties merely as the basis of residence for candidates, not for voting or representation. Each district's senator must be a resident of that district, but since his tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people in the county, and not merely those of people in his home district; thus in fact he is the county's and not merely the district's senator.

*Id.,* 379 U.S., at 438, 85 S.Ct., at 501.

Almost exactly on point is the Court's decision in *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967), which dealt with the constitutionality of what plaintiffs here refer to as a "proviso" district, although the Court did not so denominate it. There, a charter was approved by the Virginia legislature which consolidated the City of Virginia Beach, Virginia, with adjoining Princess Ann County, and established seven boroughs, one corresponding to the former boundaries of that City, and the other six corresponding to those of six magisterial districts. The council was composed of 11 members, four of whom were elected at large, without regard to residence, but the remaining seven were elected by the entire city, i.e., by all seven boroughs, but each one of those seven was required to reside in a different one of those boroughs.

Electors of five boroughs instituted suit in the federal District Court claiming that the consolidation plan, in its distribution of voting rights, violated the principle of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964),[10] and asking for the con-

10. *Reynolds v. Sims* held that as a basic constitu-

tional requirement, the Equal Protection Clause

vening of a three-judge court. A three-judge court was convened but held that it had no jurisdiction, since the issue was a local matter, and transferred the case to the District Court, which approved the charter's plan, called the "Seven–Four Plan" plan, for the election of councilmen. Upon appeal, the Fourth Circuit Court of Appeals reversed the District Court. *Davis v. Dusch,* 361 F.2d 495 (1966).

Upon appeal thereto, the Supreme Court reversed the Circuit Court of Appeals, and in so doing held that

> The Seven–Four Plan makes no distinction on the basis of race, creed or economic status or location. Each of the 11 councilmen is elected by a vote of all the electors in the city. The fact that each of the seven councilmen must be a resident of the borough from which he is elected, is not fatal. In upholding a residence requirement for the election of state senators from a multi-district county we said in *Fortson v. Dorsey,* 379 U.S. 433, 438, 13 L.Ed.2d 401, 404, 85 S.Ct. 498 [501]: [And here the court quoted from *Fortson* the same paragraph quoted in this opinion at p. 625 *supra* ].
>
> By analogy the present consolidation plan [Seven–Four] uses boroughs in the city "merely as the basis of residence for candidates, not for voting or representation." He is nonetheless the city's, not the borough's, councilman. In Fortson there was substantial equality of population in the senatorial districts, while here the population of the boroughs varies widely. If a borough's resident on the council represented in fact only the borough, residence being only a front, different conclusions might follow. But on the assumption that Reynolds v. Sims controls, the constitutional test under the Equal Protection Clause is whether there is an "invidious" discrimination. 377 U.S., at 561, [84 S.Ct. at 1381], 12 L.Ed.2d at 527.

*Id.,* 387 U.S., at 115–16, 87 S.Ct. at 1555–56.

In *Dallas County v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975) (*per curiam*), the appellees, residents of Selma, Alabama, sued challenging the system by which members of the Dallas County Commission were elected. That system, established by state statute, provided for county-wide balloting for each of the four county commissioners, but required that one of them be elected from each of four residency districts. Appellees' constitutional claim was premised on the fact that the populations of the four districts varied widely, with the result that only one member of the City of Selma could be a member of the commission notwithstanding that the City contained about one-half of the county's population.

The District Court, relying on *Dusch v. Davis, supra,* entered summary judgment for the appellants, holding that since each county commissioner's tenure depended upon the vote of the qualified voters from the county-wide electorate, each such commissioner was required to represent the county and not just his own residential area. The Court of Appeals for the Fifth Circuit, sitting en banc, reversed, the majority concluding that the unequal residency districts diluted the votes of city residents, and that the resulting discrimination was invidious. *Reese v. Dallas County,* 505 F.2d 879 (1974). The dissenters opined that *Dusch* controlled. *Id.* at 888–90.

On appeal, the Supreme Court agreed with the dissenters and reversed, stating:

> *Dusch* reaffirmed the principle enunciated in *Fortson v. Dorsey,* 379 U.S. 433, 438, 13 L.Ed.2d 401, 85 S.Ct. 498 [501] (1965), that when an official's "tenure depends upon the county-wide electorate he must be vigilant to serve the interests of all the people of the county, and not merely those of people in his home district." Because the districts in the present plan are used "merely as the basis of residence for candidates, not for voting or representation," *ibid.; Dusch v. Davis,* supra [387 U.S.], at 115, [87 S.Ct., at 1556], each commissioner represents the citizens of the entire county and not merely those of the district in which he resides.

*Id.,* 421 U.S., at 479–80, 95 S.Ct., at 1707.

The Court pointed out that when such a plan becomes effective, should a borough's

---

of the Fourteenth Amendment demanded no less than substantially equal representation for all

citizens who vote in a state regardless of their place of residence therein.

resident on the council in fact represent only his borough, and not the county, then a different conclusion might follow, but added

> We think it clear, however, that Dusch contemplated that a successful attack raising such a constitutional question must be based on findings in a particular case that a plan in fact operates impermissibly to dilute the voting strength of an identifiable element of the voting population.[11]

*Id.*, 421 U.S., at 480, 95 S.Ct., at 1708.

This court perceives that the issue raised by plaintiffs' claim that the two proviso districts created by H.B. 4043 are unconstitutional, is in substance not essentially different from the issues raised by similar claims made in *Fortson, Dusch* and *Dallas County,* and that the Court's decisions in those cases are controlling authority on that issue. The court accordingly holds those two proviso districts created by H.B. 4043 are not unconstitutional under the provisions of the Equal Protection Clause of the Fourteenth Amendment and that H.B. 4043 is not rendered unconstitutional in virtue of its providing for those proviso districts.

### Gerrymandering issue

The court pointed out in *Republican Party of Virginia v. Wilder,* 774 F.Supp. 400, 403–04 (W.D.Va.1991):

> In *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), the Supreme Court held that partisan gerrymandering cases are justiciable under the Equal Protection Clause of the Fourteenth Amendment. 478 U.S. at 143, 106 S.Ct. at 2816. While a majority agreed that such claims were justiciable, there was no majority opinion as to the test for determining whether an equal protection violation had occurred. Therefore, we follow the plurality opinion because it provides the narrowest grounds for decision. *Badham v. March Fong Eu,* 694 F.Supp. 664, 668–69 (N.D.Cal.1988), aff'd, 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 [1989], citing *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977).

To establish an Equal Protection violation in this, a partisan gerrymandering case, the Republicans [plaintiffs] must "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." 478 U.S. at 127, 106 S.Ct. at 2808.

[W]e are of opinion that the Republicans have proved that the Virginia legislature intended to discriminate against Republicans when it adopted HB 3001. As stated in *Bandemer,* "[a]s long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." 478 U.S. at 129, 106 S.Ct. at 2809. However, even if the district boundaries were drawn *solely* for partisan ends, which has not been proven here [and this court finds and holds it not to have been proven by the plaintiffs in the case *sub judice* ], that would not be, in and of itself, a violation of the Equal Protection Clause. 478 U.S. at 138–139, 106 S.Ct. at 2813.

To succeed on their claim, the Republicans [plaintiffs] must prove an actual discriminatory effect. 478 U.S. at 127, 106 S.Ct. at 2807. A *de minimus* effect is insufficient. 478 U.S. at 134, 106 S.Ct. at 2811. There must be "evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process." 478 U.S. at 133, 106 S.Ct. at 2810. There must be proof that "the challenged legislative plan has had or will have effects that are sufficiently serious to require intervention by the federal courts in state reapportionment decisions." 478 U.S. at 134, 106 S.Ct. at 2811. "[U]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." 478 U.S. at 132, 106 S.Ct. at 2810.

(Footnotes omitted.)

---

11. In each of *Fortson,* which involved the election of senators from multi-member county districts, and *Dusch,* which involved the election of borough councilmen, the Court had made this same point.

**628**

A map of the State of West Virginia having the districts created by H.B. 4043 superimposed thereon shows all of those districts to be compact in shape and to present no grotesquery in their configurations.

▮ The evidence of both the plaintiffs and defendants establishes that most, if not all, of the delegates serving in the Legislature during the 1991–92 sessions thereof, when reapportionment legislation that culminated in the enactment of H.B. 4043 was being considered, strongly desired that the districts from which they would respectively stand for election, pursuant to the reapportionment legislation to be enacted, be drawn in such a manner as, in their opinions, would be the most politically advantageous to their re-election prospects, and they used their best efforts to achieve that result. The recognition of incumbency concerns is not unconstitutional *per se, White v. Weiser,* 412 U.S. 783, 791, 93 S.Ct. 2348, 2352, 37 L.Ed.2d 335 (1973), nor does the drawing of district boundaries so as to minimize the number of contests between present incumbents in and of itself establish invidiousness, *Burns v. Richardson,* 384 U.S. 73, 89 n. 16, 86 S.Ct. 1286, 1295 n. 16, 16 L.Ed.2d 376 (1966). However, neither can justify a population malapportionment of unconstitutional magnitude.

▮ The evidence above summarized shows that the five incumbent Republican Delegates who testified as plaintiffs' witnesses herein were not entirely satisfied with H.B. 4043's reapportionment of the districts, created by the 1982 Act, from which they were elected. Given that the 1982 Act provided for 27 multi-member districts and 13 single-member ones, a total of 40 districts, which H.B. 4043 reapportioned into 23 multi-member and 33 single-member districts, a total of 56 districts, it is surprising that many more of the 100 incumbent delegates in the Legislature whose reelection prospects could have been adversely affected by the enactment of H.B. 4043 did not testify at the trial herein. If the gerrymandering alleged to have been effected by H.B. 4043 was as flagrant and widespread as plaintiffs' allegations would seem to indicate, it also strikes the court as being more than passing strange that only five of the 26 incumbent Republican incumbents were called or saw fit to testify on plaintiffs' behalf at the trial hereof. None of the named plaintiffs testified.

In addition to the court's findings and holdings appearing hereinabove in respect to the plaintiffs' First, Second and Third causes, the court further finds and holds in respect to those causes that neither the plaintiffs' evidence, nor for that matter that of the case as a whole, proved "intentional discrimination against an identifiable political group ... [or] an actual discriminatory effect on that group," nor constitute "evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process," or prove either that "the challenged legislative plan [H.B. 4043] has had or will have effects that are sufficiently serious to require intervention by the federal courts in state [West Virginia's] reapportionment decisions," or that H.B. 4043 caused "the electoral process ... [to be] arranged in a manner that will consistently degrade a voters' or a group of voters' influence on the political process as a whole," or that it provides any group "less opportunity to participate in the political processes and to elect [delegate] candidates of their choice," or that it would operate to produce "a lack of responsiveness by those [delegates who may be elected thereunder] to the concerns of ... [any] group," as this court evaluates that evidence in the light of those evidentiary prerequisites needed to be proved to establish unconstitutionality, as stated in *Badham.* Such gerrymandering, if any, that occurred in respect to the processes culminating in the enactment of H.B. 4043 was *de minimus.*

### Fourth cause

▮ This cause alleges that H.B. 4043 violates the First Amendment of the Constitution of the United States,[12] which protects

---

12. The First Amendment provides:
    Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the

the fundamental rights of freedom of speech and association, in that H.B. 4043 operates invidiously to discriminate against Republican voters solely because of their party affiliations, political beliefs and associations, by chilling public debate on issues of public importance, by burdening plaintiffs' rights to associate for political ends and to cast their votes effectively and by chilling the ability of Republican candidates to raise campaign funds in order to promote name recognition and thereby ameliorate and overcome the statewide Democratic registration advantage in the State.

In *Badham v. March Fong Eu, supra,* the plaintiffs made the same claim as that made by the plaintiffs in this fourth cause. The court held that the plaintiffs there had failed to allege a violation of their First Amendment rights and dismissed their third cause in which that claim was made. In so doing, it said:

> It is well-settled that the "First Amendment protects political association as well as political expression." *Buckley v. Valeo,* 424 U.S. 1, 15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976). However, plaintiffs have failed to explain *how* A.B. 2X [the reapportionment statute in issue] penalizes the exercise of their First Amendment rights. Plaintiffs assert that A.B. 2X "negat[es] the effect of plaintiffs' votes and the votes of members of their party," but this claim ignores the fact that Republican votes were sufficiently effective to elect 18 Representatives.

\* \* \* \* \* \*

Plaintiffs maintain that *Williams [v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968)] protects the "right of qualified voters, regardless of political persuasion, to cast their votes *effectively,*" 393 U.S. at 30, 89 S.Ct. at 10 (emphasis added), and that their votes are rendered ineffective in those districts where there is a Democratic majority. We reject this contention. As the court stated in *Bandemer:* "[a]n individual or a group of individuals who votes

for a losing candidate is usually deemed to be adequately represented by the winning candidate and to have as much opportunity to influence that candidate as other voters in the district. ... This is true even in safe districts where the losing group loses election after election." [478 U.S. at 132] 106 S.Ct. at 2810. Although plaintiffs have generally alleged that Democratic incumbents "need [not] attend to the views of fragmented and submerged Republican minorities in their districts," they pointedly do not allege that Democratic representatives have in fact "entirely ignore[d]" the interests of those voters. *Id.*

Finally, the argument that A.B. 2X "chills" meaningful debate on political issues is wholly without merit. The concept of a "chilling effect" is associated with the doctrine of overbreadth, and describes the situation where persons whose expression is protected are deterred from exercising their rights by the existence of an overly broad statute regulating speech. *See, e.g., New York v. Ferber,* 458 U.S. 747, 768, 772 & n. 27, 102 S.Ct. 3348, 3360, 3362 & n. 27, 73 L.Ed.2d 1113 (1982).

*Id.,* 694 F.Supp., at 675 (Footnote omitted).

Plaintiffs here have also failed to allege, much less prove, a violation of their First Amendment Rights, for which reasons their fourth cause of action is dismissed.

### Fifth cause

Finally, plaintiffs allege that H.B. 4043 violates article IV, § 4 of the Constitution of the United States,[13] in that it creates and results in a defective electoral structure for legislative districts in the State by violating, in its operation, plaintiffs' rights under the first and fourteenth amendments thereof.

Plaintiffs' claim in this fifth cause must also be dismissed. The plaintiffs in *Badham* also made the same claim, and the court there disposed of that claim by stating

> This contention is easily dismissed on the authority of *Baker v. Carr,* 369 U.S. 186,

---

people peaceably to assemble, and to petition the Government for a redress of grievances.

**13.** Article IV, section 4 thereof provides, in part:

The United States shall guarantee to every State in this Union a Republican Form of Government. ...

223–24, 82 S.Ct. 691, 713–14, 7 L.Ed.2d 663 (1962), and the cases cited therein. In *Baker,* the Court noted that it "has consistently held that a challenge to state action based on the Guaranty Clause presents no justiciable question." *Id.* at 224, 82 S.Ct. at 714. With respect to the reapportionment challenge before it, the Court specifically stated that "any reliance on [the Guaranty] clause would be futile." *Id.* at 227, 82 S.Ct. at 715. This result is not altered by *Bandemer's* holding that an equal protection challenge to a partisan gerrymander is justiciable; *Baker* specifically distinguished the equal protection claim before the Court from the non-justiciable claims based on the Guaranty Clause.

*Id.,* 694 F.Supp., at 675–76.

For the foregoing reasons, plaintiffs' fifth cause of action presents a non-justiciable issue and is therefore dismissed.

Accordingly, the defendants' motion that the plaintiffs' complaint be dismissed and judgment entered in favor of the defendants is GRANTED.

An appropriate order will be entered, contemporaneously with the filing of this Memorandum Opinion in the office of the Clerk of this court, ordering dismissal of the plaintiffs' complaint with prejudice and granting judgment herein in favor of the defendants.